GEORGE S. CANELLOS
REGIONAL DIRECTOR
Andrew M. Calamari
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Aaron Arnzen *(Not admitted in New York)*
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100

# 10 CIV 8702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

        - against -

JOANN CRUPI,

                       Defendant.

10 Civ. ___

-----------------------------------------------------------------------x

## COMPLAINT

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant JoAnn "Jodi" Crupi ("Crupi," the "Defendant"), alleges:

### SUMMARY

      1.      Crupi, a longtime employee of Bernard L. Madoff Investment Securities LLC (BMIS), played an instrumental and sustained role in perpetuating Bernard L. Madoff's ("Madoff") massive securities and advisory fraud.

      2.      Crupi was responsible for supervising the bank accounts used in BMIS' investment advisory business and facilitated clients' investments with BMIS, all the

## THE DEFENDANT

10.    **Crupi**, age 49, resides in Westfield, New Jersey. Crupi was employed at BMIS from July 1983 until December 2008, working alongside DiPascali in BMIS' 17th floor offices in the "Lipstick Building" in Manhattan. Crupi is not registered as a representative associated with any broker-dealer, nor has she ever had any registration in the securities industry.

## OTHER INDIVIDUALS AND ENTITIES

11.    **Madoff**, age 72, was the sole owner of BMIS. Until December 12, 2008, Madoff, a former chairman of the board of directors of the NASDAQ stock market, oversaw and controlled the investment adviser services at BMIS as well as the overall finances of BMIS. On February 9, 2009, the District Court, with Madoff's consent, entered a partial judgment in the Commission's case against Madoff. On March 12, 2009, Madoff pled guilty to 11 felony counts relating to his orchestration of the Ponzi scheme. Madoff admitted in his allocution, among other things, that since at least the early 1990s, he had falsely indicated on customer documents that securities transactions had taken place when no such transactions had occurred for investor accounts. On June 29, 2009, Madoff was sentenced to 150 years in prison and an order was entered forfeiting his assets. Madoff is currently incarcerated in a federal prison in North Carolina.

12.    **BMIS** registered with the Commission as a broker-dealer in 1960 and as an investment adviser in September 2006 and used to occupy floors 17-19 of the Lipstick Building. BMIS purportedly engaged in three different operations: investment adviser services (housed on the 17th floor), market making services, and proprietary trading

while aware of how money flowed into and out of Madoff's Ponzi scheme, and thus was aware that the robust and profitable returns that BMIS reported to investors was completely fictional.

3.     For at least eight years, Crupi also manufactured false account statements for a group of funds managed by a BMIS investor (the "D Funds"), which showed the D Funds to be highly profitable when, in fact, she knew or recklessly disregarded that all purported trading activity in the accounts was fictional.

4.     Finally, Crupi helped Madoff avoid detection of his fraud by assisting Madoff, Frank DiPascali ("DiPascali"), BMIS' portfolio manager, and others in misleading investors, auditors and regulators into believing that BMIS was a legitimate enterprise when the nature of BMIS' business was questioned.

## VIOLATIONS

5.     By virtue of the conduct alleged herein, Defendant directly or indirectly, singly or in concert, has engaged in acts, practices, schemes and courses of business that violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]; violated and aided and abetted violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and aided and abetted violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)], Sections 15(c) and 17(a) of the Exchange Act [15 U.S.C. §§ 78o(c) and 78q(a)], and Rules 10b-3 and 17a-3 thereunder [17 C.F.R. §§ 240.10b-3 and 240.17a-3], and Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

2

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking to restrain and enjoin permanently Defendant from engaging in the acts, practices and courses of business alleged herein.

7.     In addition to the injunctive relief recited above, the Commission seeks: (i) a final judgment ordering Defendant to disgorge her ill-gotten gains with prejudgment interest thereon; (ii) a final judgment ordering Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(d)]; and (iii) such other relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

9.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. The Defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices and courses of business alleged herein. A substantial part of the events comprising Defendant's wrongful conduct giving rise to the Commission's claims occurred in the Southern District of New York, and Defendant engaged in her wrongful conduct while working in a business office in this District.

(housed on the 18th and 19th floors). BMIS' many victims were both customers and clients of BMIS because it operated as both a broker-dealer and an investment advisor in relation to the investor accounts. BMIS is currently under the control of a SIPC trustee.

13.     **The D Funds** refer to a group of related limited partnership funds managed by a longtime BMIS investor, **Investor E**. The D Funds invested practically all of their assets with BMIS, and as of November 2008, BMIS statements for these funds reflected a total balance of over $950 million. Most of the direct investors in these funds were limited partnerships, which in turn were "nominee groups" consisting of many individuals.

14.     **DiPascali**, age 54, was employed at BMIS from 1975 until the firm's collapse in December 2008. From the mid-1980s, at Madoff's direction, DiPascali became involved in, and eventually oversaw, the day-to-day operations of the bulk of BMIS' multi-billion dollar advisory business. On August 11, 2009, DiPascali pleaded guilty to criminal charges related to his role in the Madoff Ponzi scheme. DiPascali admitted in his allocution that, among other things, he and others were involved in creating false account statements and trade confirmations for customers, lying to auditors and regulators who reviewed BMIS' operations and books and records, and that he knew that purported trades in investor accounts never took place. In addition, the Commission filed civil charges against DiPascali on August 11, 2009. On August 13, 2009, the District Court, with DiPascali's consent, entered a partial judgment in the Commission's case against him.

15.     **Annette Bongiorno**, age 62, resides in Manhasset, New York and Boca Raton, Florida. Bongiorno was a longtime employee at BMIS and worked on the 17th

floor with Crupi and DiPascali, among others. Bongiorno was responsible for managing the accounts of Madoff's longtime clients, most of whom were family or friends of Madoff.

## FACTS

**I.     Crupi's Responsibility over BMIS' Ponzi Scheme Account and Her
        Knowledge of the Scheme's Financial Condition**

16.     Crupi was hired by BMIS in July 1983 following her graduation from the University of Arizona. Crupi was initially employed as a keypunch operator in BMIS' investment advisory business and reported to Bongiorno, but eventually also worked with DiPascali, and supervised some of BMIS' lower-level employees.

17.     Like many employees on the 17th floor, Crupi did not have clearly delineated job duties, or hold a specific title. Crupi did, however, have exclusive control over two important aspects of the BMIS fraud described below: she handled the bank accounts used in BMIS' investment advisory business (the "Ponzi Scheme Accounts"), and she created false trading portfolios and account statements for the D Funds.

18.     Since at least the mid-1990s, Crupi had primary responsibility for a bank account (the "Main Ponzi Scheme Account") maintained at a bank in New York, New York ("Bank A") that BMIS used, among other things, to receive investor deposits and pay investor redemptions. Billions of dollars of investor funds were deposited into the Main Ponzi Scheme Account while Madoff's Ponzi scheme was underway.

19.     Had investor funds actually been used to buy and sell stocks and options on behalf of investors, billions of dollars of investor cash would have flowed into various securities positions. However, as Crupi knew or recklessly disregarded, no cash was used to buy securities positions because no securities trades took place.

20.     Instead, as Crupi knew or recklessly disregarded, the overwhelming
majority of the billions of dollars of investor deposits were maintained in the Ponzi
Scheme Accounts in highly-liquid form, including cash, treasury bills, commercial paper,
and overnight investments.

21.     The Main Ponzi Scheme Account was used to fund other bank and
brokerage accounts used in the overall operations of BMIS (the "Operating Accounts"),
as well as to fund investor redemption requests.  When an investor requested a
redemption, no securities positions were liquidated.  Instead, as Crupi knew, or recklessly
disregarded, the amounts requested were simply paid out of the Main Ponzi Scheme
Account.

22.     The Main Ponzi Scheme Account also served as a general "slush fund" for
Madoff.  Madoff had a group of internal accounts at BMIS, referred to as "BLM Special"
accounts, through which he gave money to family members, made (and then forgave)
loans to friends and family members, paid personal expenses, and made charitable
contributions.  Crupi facilitated wire transfers from the Main Ponzi Scheme Account to
the BLM Special accounts, and kept records for the BLM Special accounts in her desk
files and on her computer.

23.     Moreover, Crupi and other BMIS employees engaged in phony trades for
their benefit.  When they did so, the purported profits from these "trades" were paid out
of the Main Ponzi Scheme Account, which was under Crupi's supervision.

24.     Crupi, or BMIS employees acting at Crupi's direction, also transferred
investor funds from the Main Ponzi Scheme Accounts to the Operating Accounts in order
to prop up the liquidity and reported financial results of BMIS' market making and

proprietary trading businesses.

25.     Through her handling of this account, Crupi knew or recklessly disregarded the true financial condition of Madoff's scheme. Crupi kept a daily record of the funds deposited in and withdrawn from the Main Ponzi Scheme Account, and memorialized this information daily on index cards and sheets that she maintained by hand. Moreover, Crupi prepared or directed the preparation of daily reports for Madoff reflecting how much investor money was deposited and withdrawn from the Main Ponzi Scheme Account. When the account balance grew high, Crupi advised DiPascali as to the balance, and DiPascali used the cash in the Main Ponzi Scheme Account to purchase short-term Treasury bills or commercial paper in order for the cash to achieve a better interest rate until it was needed to fund investor redemptions or some other personal need of Madoff. These government-backed securities and commercial paper were held in another account at Bank A. If the Main Ponzi Scheme Account balance grew too low to cover withdrawals, Crupi asked Madoff or DiPascali if they were anticipating any incoming cash to cover the withdrawals, and if not, she asked DiPascali to redeem some of the account's affiliated Treasury bill positions to cover the withdrawals.

26.     Crupi thus knew of, or recklessly disregarded, the financial condition of Madoff's Ponzi scheme, including during time periods when the scheme was in financial trouble. For example, in the fall 2005, BMIS' suffered a liquidity crisis. To survive this crisis, Madoff asked a wealthy longtime investor for a loan. This investor loaned BMIS $100 million in government-backed securities in November 2005, which BMIS used as collateral for a loan from a bank. The investor loaned Madoff an additional $50 million in securities in January 2006, which Madoff used as collateral for similar loan from the

8

same bank. The proceeds of the loan were deposited into the Main Ponzi Scheme Account, and Crupi noted this deposit in her daily report as a "BLM special loan." These amounts were used shortly thereafter to pay investor redemptions.

27.     On several occasions during this period, the Main Ponzi Scheme Account lacked sufficient funds to satisfy investor redemptions, so BMIS satisfied investor redemptions with funds held in the Operating Accounts. Crupi noted these redemptions on her daily reports.

28.     During the final months before BMIS' collapse, Crupi was aware of, or recklessly disregarded, the Ponzi scheme's true financial condition. Following the market collapse in September 2008, investor redemptions spiked dramatically, and over $6 billion was distributed to investors in the final three months of the fraud. By early December 2008, only a few hundred million dollars remained in the Main Ponzi Scheme Account, even though the reported total net equity of BMIS' investors totaled over $65 billion. Crupi tracked these late 2008 redemptions, in her own handwriting, on her notecards and sheets.

29.     In addition to her awareness, or reckless disregard, of the Ponzi scheme and of its dwindling assets, on December 3, 2008, DiPascali told Crupi that the scheme was on the verge of collapse. The following weekend, DiPascali and Crupi met to discuss BMIS' imminent collapse and the implications of the collapse in more detail. Even though Crupi was specifically aware of Madoff's Ponzi scheme, she continued to process client deposits. From December 3 to December 10, 2008, Crupi deposited approximately $48 million of client checks into BMIS' Main Ponzi Scheme Account.

30.     In the final days of the fraud, when the money available to meet investor

redemptions had dwindled to a few hundred million dollars, DiPascali convinced Madoff

to use the remaining funds to liquidate the accounts of family and friends of the firm,

including employees, and not to honor redemption requests by the larger institutional

investors. To that end, DiPascali, Crupi, and another BMIS employee reviewed BMIS

investor lists and identified which accounts should be liquidated. Madoff approved of

these liquidations, and Crupi then prepared checks for these selected investors from the

Main Ponzi Scheme Account, totaling more than $350 million. Madoff was arrested and

the checks were seized before they could be distributed.

## II.    Crupi's Preparation of False Account Statements for the D Funds

31.     Another of Crupi's job responsibilities was preparing fictitious BMIS

account statements related to a purported hedging strategy using baskets of stock for a

group of limited partnership funds (the "D Funds") managed by a longtime BMIS

investor, Investor E. From approximately the early 2000s onward, Crupi prepared the D

Funds' monthly BMIS account statements to reflect fictitious trades and false returns.

These false returns provided the basis for Investor E to receive millions of dollars in

performance fees. All of the trading in these accounts was fictitious.

32.     At the beginning of each year, Madoff communicated to Crupi the rate of

return the D Funds were to achieve that year. Crupi ensured that the D Funds "earned"

this rate of return by using historical prices obtained from printouts from a Bloomberg

terminal (such terminals facilitate access to financial information) to assemble a fictional

"basket" of profitable trades, using Excel to calculate the profit of the basket.

Additionally, each individual stock in the basket was hedged with fictitious puts and

calls. Once Crupi had selected a profitable basket of trades, she asked DiPascali to

review the basket, and then she or DiPascali would instruct the data entry clerks on the 17th floor to run a computer program to simulate the purchase and sale of the basket by each of the D Funds, and to create confirmations and statements reflecting those trades. (Each fund purchased the same fictitious "basket," but in different share quantities based in part on their relative size.)

33.    Crupi double-checked each Fund's value as the end of a quarter approached to make sure that the Funds were on target to achieve their annual return. Typically, at the end of the third month of every quarter, Crupi determined the total dollar amount that each Fund should have "earned" by the end of the quarter, based on the Fund's equity value at the close of the preceding quarter. Crupi then subtracted the purported earnings already achieved in the first two months of the quarter, resulting in a dollar amount that she "needed" to earn in the final month for each Fund in order to achieve the rate of return. Crupi then constructed the "basket" of trades for the Funds that earned approximately the amount each "needed," and again had the data entry clerks enter this basket into the computer system to produce statements that represented that the D Funds had engaged in these trades. Crupi memorialized this work in folders containing, among other things, her handwritten notes and calculations, and Excel spreadsheets.

34.    At the end of each quarter, Crupi also noted any "overstatement" or "understatement" of profits that resulted due to rounding errors, and took that amount into account when calculating the following quarter's return in her handwritten calculations.

35.    The result of Crupi's work was the creation of trade tickets and account

statements for these Funds that reflected profitable, albeit nonexistent, trading activity, and that achieved a near-consistent rate of return, practically identical every quarter.

## III.    Crupi's Assistance in BMIS Cover-Ups

36.     In addition to maintaining BMIS' Main Ponzi Scheme Account and creating false account statements and trade tickets for the D Funds, Crupi assisted in BMIS' efforts to avoid detection by regulatory agencies and auditors. In particular, had BMIS ever actually traded or held securities positions for its IA clients, these positions would have been reflected in records maintained by the Depository Trust Clearing Corporation ("DTCC"). As the central securities depository in the United States, DTCC maintains records of securities trades and positions for its members. Because BMIS never engaged in any trading or held any real securities positions for its IA clients, there were no real DTCC records that corresponded to the positions purportedly held by BMIS' IA clients and reflected on the clients' statements. One tactic, devised by DiPascali, was to claim, if asked, that the assets were not custodied at BMIS because BMIS only functioned as an executing broker on an RVP/DVP (receive-versus-payment and delivery-versus-payment) basis. To substantiate this story, DiPascali directed that the titles for the special accounts be changed to indicate that the assets were custodied elsewhere. For example, an account in the name of "John Doe" was changed to "European Bank for the benefit of John Doe" on the fictitious set of account statements and trade reports prepared for auditors or regulators. In this way, the assets were purportedly custodied at European Bank and there would be no reason for a regulator or auditor to ask the Depository Trust Clearing Corporation ("DTCC") for records that reflected BMIS holdings. Crupi assisted in this ruse by researching for DiPascali banks that could serve as phony custodians on customer statements.

12

IV.     **Crupi's Financial Gain from Her Role in the Fraud**

37.     Crupi benefited financially from BMIS' fraud. Crupi earned a generous annual salary from BMIS that exceeded $350,000 by 2008.

38.     Further, in June 2008, Crupi wired $475,000 from the Main Ponzi Scheme Account to an outside bank account. This amount eventually was wired back to BMIS, credited to Crupi's account at BMIS, and subsequently transferred to the account of her domestic partner. In November 2008, $742,000 was transferred from the Main Ponzi Scheme Account to Crupi's partner's bank account; these funds were used, in part, to pay a portion of Crupi's 2008 income taxes.

39.     In late 2008, Crupi also wired $2.25 million from the Main Ponzi Scheme Account to an outside bank account. This money was used by Crupi to purchase a beach house in New Jersey.

40.     Crupi also had access to BMIS' American Express credit card. From 2004 through 2008, Crupi accrued at least $270,000 in expenses on the firm's credit card for which she never reimbursed the firm.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act
### (Antifraud violations)

41.     Paragraphs 1 through 40 are realleged and incorporated by reference as if set forth fully therein.

42.     Defendant, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails and/or wires, directly and indirectly, has employed devices, schemes and artifices to defraud.

43.     By reason of the activities herein described, the Defendant has violated

Section 17(a)(1) of the Securities Act. [15 U.S.C. § 77q(a)(1).]

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act
### (Antifraud violations)

44.     Paragraphs 1 through 40 are realleged and incorporated by reference as if

set forth fully herein.

45.     Defendant, in the offer and sale of securities, by the use of the means and

instruments of transportation and communication in interstate commerce or by the use of

the mails and/or wires, directly and indirectly, has obtained money and property by

means of untrue statements of material fact or omissions to state material facts necessary

in order to make the statements made, in light of the circumstances under which they

were made, not misleading, and has engaged in transactions, practices or courses of

business which have operated as a fraud and deceit upon investors.

46.     By reason of the activities herein described, the Defendant has violated

Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and

77q(a)(3)].

## THIRD CLAIM FOR RELIEF

### Violations of, and Aiding and Abetting Violations of,
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Antifraud violations)

47.     Paragraphs 1 through 40 are realleged and incorporated by reference as if

set forth fully therein.

48.     Defendant, in connection with the purchase and sale of securities, directly

and indirectly, by the use of the means and instrumentalities of interstate commerce or of

the mails and/or wires, have employed devices, schemes and artifices to defraud; have

made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which operated as a fraud and deceit upon investors.

49.     By reasons of the activities herein described, Defendant violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

50.     Further, from at least the 1980s through December 11, 2008, Madoff, DiPascali and BMIS, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails and/or wires, have employed devices, schemes and artifices to defraud; have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which operated as a fraud and deceit upon investors.

51.     As described in the paragraphs above, Madoff, DiPascali and BMIS violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

52.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted Madoff's, DiPascali's and BMIS' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5]. Specifically, Defendant knowingly provided substantial assistance to Madoff, DiPascali, and BMIS in committing such

15

violations.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations
### of Sections 206(1) and 206(2) of the Advisers Act
### (Fraud upon Advisory Clients and Breach of Fiduciary Duty
### by Investment Adviser)

53.     Paragraphs 1 through 40 are realleged and incorporated by reference as if set forth fully herein.

54.     Madoff and BMIS at all relevant times were investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

55.     Madoff and BMIS directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]: (a) employed devices, schemes, and artifices to defraud any client or prospective client; or (b) engaged in acts, practices, or courses of business which operate as a fraud or deceit upon any client or prospective client.

56.     As described in the paragraphs above, Madoff and BMIS violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

57.     By reason of the activities described herein, and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Defendant aided and abetted Madoff's and BMIS' violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].  Specifically, Defendant knowingly provided substantial assistance to Madoff and BMIS in committing such violations.

16

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 15(c) of the Exchange Act and Rule 10b-3
### (Fraud Upon Customers by Broker-Dealer)

58.     Paragraphs 1 through 40 are realleged and incorporated by reference as if set forth fully herein.

59.     BMIS was a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)].

60.     From at least the 1980s through December 11, 2008, BMIS, while a broker, by engaging in the conduct described above, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities (other than commercial paper, bankers' acceptances or commercial bills) otherwise than on a national securities exchange of which BMIS was a member, by means of manipulative, deceptive, or other fraudulent devices or contrivances.

61.     BMIS' manipulative, deceptive, and fraudulent devices or contrivances included misrepresentations to customers that securities transactions with certain characteristics occurred, and securities were held, in their accounts when no such transactions occurred and no such securities were held in customers' accounts.

62.     As described in the paragraphs above, BMIS violated Sections 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

63.     By reason of the activities described herein, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted BMIS' violations of Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3]. Specifically, Defendant knowingly provided substantial assistance

17

to BMIS in committing such violations.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17(a)
### of the Exchange Act and Rule 17a-3
### (Broker-Dealer Books and Records Violations)

64.    Paragraphs 1 through 40 are realleged and incorporated by reference as if set forth fully herein.

65.    As a registered broker-dealer, BMIS was required to make and keep certain books and records current and accurate pursuant to Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].  In particular, Rule 17a-3(a)(2) requires broker-dealers to keep current ledgers and all other records that reflect all assets and liabilities, and income and expense and capital accounts.

66.    As set forth above, BMIS failed to make and keep certain books and records current and accurate.  BMIS, among other things, manufactured and maintained records that falsely reflected BMIS' assets and liabilities, and income and expense and capital accounts.

67.    As a result, BMIS violated Section 17(a) of the Exchange Act and Rule 17a-3 promulgated thereunder [15 U.S.C. § 78q(a) and 17 C.F.R. § 240.17a-3].

68.    By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted the violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].  Specifically, Defendant knowingly provided substantial assistance to BMIS in committing such violations.

## SEVENTH CLAIM FOR RELIEF

### Aiding and abetting violations of Section 204 and
### Rule 204-2 of the Advisers Act
### (Adviser Books and Records Violations)

69.     Paragraphs 1 through 40 are realleged and incorporated by reference as if set forth fully herein.

70.     BMIS at all relevant times was an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

71.     BMIS failed to make, maintain on its premises, or keep accurate, certain books and records required by law. For example, BMIS failed to make, maintain on its premises or keep accurate, true and accurate journals, including cash receipts and disbursement records. It also failed to make, maintain on its premises or keep accurate, true and accurate ledgers reflecting asset, liability, reserve, capital, income and expense accounts, and true and accurate check books, bank statements, cancelled checks and cash reconciliations. Among other things, BMIS manufactured and maintained fictitious securities holdings and fictitious securities transactions in investors' accounts, and fake DTCC records.

72.     By reason of the foregoing, BMIS violated Section 204 of the Advisers Act [15 U.S.C. § 80b-4], and Rule 204-2 thereunder [17 C.F.R. § 275.204-2], and Defendant aided and abetted BMIS' violations. Specifically, Defendant knowingly provided substantial assistance to BMIS in committing such violations.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment against Defendants granting the following relief:

### I.

Finding that Defendant violated the securities laws and rules promulgated thereunder as alleged herein.

## II.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## III.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## IV.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## V.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

## VI.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

## VII.

Permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 204 of the Advisers Act [15 U.S.C. § 80b-4], and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

## VIII.

Directing Defendant to disgorge her ill-gotten gains, plus prejudgment interest thereon.

## IX.

Directing Defendant to pay civil money penalties.

## X.

Granting such other and further relief as to this Court seems just and proper.

Dated: New York, New York
 *Nov. 17*, 2010

SECURITIES AND EXCHANGE COMMISSION

By: _____
            George S. Canellos
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281-1022
(212) 336-1100

Of Counsel:

Andrew M. Calamari
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Aaron Arnzen *(Not admitted in New York)*
Kristine M. Zaleskas